UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **YSLETA DEL SUR PUEBLO**, *a federally recognized sovereign Indian tribe*, | § § § § | |
| *Plaintiff*, | § | |
| v. | § | EP-17-CV-00162-DCG |
| | § | |
| **CITY OF EL PASO**, | § § | |
| *Defendant.* | § § | |

## MEMORANDUM OPINION AND ORDER

Presently before the Court is Defendant City of El Paso's ("City") "Motion for Summary Judgment" (ECF No. 56) ("City's Motion") and Plaintiff Ysleta del Sur Pueblo's ("Pueblo") "Motion for Summary Judgment" (ECF No. 57) ("Pueblo's Motion"). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the City's Motion.

### I. BACKGROUND

Plaintiff Ysleta Del Sur Pueblo is a federally recognized Indian Tribe.[1] In May 2017, the Pueblo brought this declaratory judgment action, pursuant to 28 U.S.C. §§ 1331, 1362, and 2201. It seeks judicial confirmation of the Pueblo's title to 111.73 acres of real property ("Property") encompassed by what is described as "the Ysleta Grant";[2] the Pueblo alleges that it is the owner of the Property under the 1751 Spanish Land Grant.[3] It also asks the Court to enjoin the City from claiming any estate, right, title, or interest in or to the Property.[4]

---

[1] Verified Compl. for Declaratory J. Confirming Title to Real Prop. ¶ 1 [hereinafter "Complaint"], ECF No. 1.

[2] *Id.* ¶ 5.

[3] *Id.* ¶¶ 27–29.

[4] *Id.* at 6.

On July 29, 2019, the City filed its instant motion for summary judgment. *See* City's Mot., ECF No. 56. That same day, the Pueblo also filed its instant motion for summary judgment. *See* Pueblo's Mot., ECF No. 57.

## II. DISCUSSION

By its Motion, the City asserts that the Court should grant summary judgment in its favor because: (1) no dispute of facts exists regarding the absence of a 1751 Spanish Land Grant confirmed by a 1825 survey the Mexican government conducted; (2) the Court lacks subject-matter jurisdiction because the 1751 Spanish Land Grant has not been confirmed by Congress; (3) the Pueblo's claim is barred by the doctrine of laches; and (4) the State of Texas is a Federal Rule of Civil Procedure 19 required party which cannot be joined, and the resulting unavoidable prejudice to the State requires dismissal under Rule 19(b). City's Mot. at 3, 6, 19, 26.

By its Motion, the Pueblo argues that the Court should grant summary judgment in its favor because: (1) the Pueblo had official legal status as a "Pueblo de Indios" under Spanish colonial law, which meant that Spanish colonial law afforded the Pueblo's lands full protection as to prohibiting Spanish settlement on Indian lands, its privatization, and its alienation or conveyance to non-Indians; and (2) the Indian Non-Intercourse Act applies to the Property it claims. Pueblo's Mot. at 2, 10.

As a preliminary matter, the Court addresses the City's contention that the Court lacks subject-matter jurisdiction to decide the Pueblo's claim on the merits. When dismissal is sought for lack of subject-matter jurisdiction, the proper procedural form is a Rule 12(b)(1) motion to dismiss, not summary judgment. *Stanley v. Cent. Intelligence Agency*, 639 F.2d 1146, 1157 (5th Cir. 1981). Although the City filed a motion seeking summary judgment against the Pueblo, the Court construes the City's Motion as a motion to dismiss for lack of subject-matter jurisdiction

and a motion for summary judgment in the alternative. *See United States v. One 1988 Dodge Pickup*, 959 F.2d 37, 39 (5th Cir. 1992) ("[I]t is clear that the proper characterization of the motion for these purposes is not determined by the label that the motion bears."); *Med. Components, Inc. v. Osiris Med., Inc.*, 226 F. Supp. 3d 753, 760 (W.D. Tex. 2016) (construing a motion for summary judgment as a motion to dismiss for lack of subject-matter jurisdiction).

"When considering a Rule 12(b)(1) motion to dismiss with a motion for summary judgment in the alternative, we must determine if subject matter jurisdiction is present before considering the substantive arguments of the summary judgment motion." *Cupit v. United States*, 964 F. Supp. 1104, 1106 (W.D. La. 1997) (citing *Stanley*, 639 F.2d at 1157). Thus, the Court will first address subject-matter jurisdiction in this case and will only consider the merits of both summary judgment motions if dismissal is unwarranted.

### A. Standard for Dismissal for Lack of Subject-Matter Jurisdiction

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . ." *Kokkonen v. Guardian Life Insurance Co., of Am.*, 511 U.S. 375, 377 (1994). But "[w]ithout jurisdiction[,] the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). Federal courts are under a mandatory duty to dismiss a suit over which it has no jurisdiction. *Stanley*, 639 F.2d at 1157 (internal citations omitted). A court may properly dismiss a case for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).

"In considering a challenge to subject matter jurisdiction, the district court is 'free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to

hear the case.'" *Flores v. Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019) (quoting *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005)). A district court may dispose of a motion to dismiss or lack of subject matter jurisdiction based "on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (quoting *Robinson v. TCI/US W. Commc'ns Inc.*, 117 F.3d 900, 904 (5th Cir. 1997)).

### B. The Pueblo Asserts Federal Question Jurisdiction Under 28 U.S.C. §§ 1331 and 1362

The Pueblo asserts that the Court has subject-matter jurisdiction to consider its claim under 28 U.S.C. § 1331 for federal question jurisdiction and under 28 U.S.C. § 1362 for civil lawsuits brought by Indian tribes. Compl. ¶ 6. Both § 1331 and § 1362 contain identical "arising under" language. *Compare* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions *arising under the Constitution, laws, or treaties of the United States*.") (emphasis added) *with* 28 U.S.C. § 1362 ("The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body recognized by the Secretary of the Interior, wherein the matter in controversy *arises under the Constitution, laws, or treaties of the United States*.") (emphasis added). Section 1362 was enacted when § 1331 had a monetary requirement, similar to that now found in 28 U.S.C. § 1332, and was intended to permit Indian tribes to proceed in federal court even when the jurisdictional amount could not be met:

> The purpose of the proposed legislation is to provide that the district courts are to have original jurisdiction of all civil actions brought by Indian tribes or bands wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States. These civil actions would therefore be permitted without regard to the $10,000 jurisdictional amount provided in section 1331(a) of title 28, when brought by an Indian tribe or band under the authority of the new section added by the bill.

H.R. Rep. 89-2040 *as reprinted in* 1966 U.S.C.C.A.N. 3145, 3146; *see also Oneida Indian Nation of N. Y. State v. Oneida Cty., New York*, 414 U.S. 661, 663 (1974) [hereinafter "*Oneida I*"] (noting the same); *Ponca Tribe of Indians of Okla. v. Contl. Carbon Co.*, 439 F. Supp. 2d 1171, 1174–75 (W.D. Okla. 2006) (same). The Supreme Court has also noted that § 1362 may grant federal jurisdiction over a claim brought by an Indian tribe where the claim was one which the United States could have brought on the tribe's behalf. *See Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 474 (1976) ("We think that the legislative history of § [1]362, though by no means dispositive, suggests than in certain respects tribes suing under this section were to be accorded treatment similar to that of the United States had it sued on their behalf.").

At any rate, the statutory language and Supreme Court precedent indicate that § 1362 does not provide federal court jurisdiction to a claim merely because it is brought by a federally recognized Indian tribe. *Ponca Tribe*, 439 F. Supp. 2d at 1174; *Charrier v. Bell*, 547 F. Supp. 580, 584 (M.D. La. 1982) ("Although the federal government has long had a special relation to the American Indian, the Congress has not provided for jurisdiction in the federal courts merely because an Indian Tribe is a party to the action."). Indeed, § 1362 will provide a jurisdictional basis for an Indian tribe's claims only if they satisfy the "arises under" requirement of § 1331. *See Mescalero Apache Tribe v. Martinez*, 519 F.2d 479, 483 (10th Cir. 1975) ("[Section] 1362 does not in our view dispense with the necessity of showing the presence of a federal question. . . . [I]n order for jurisdiction to attach under [§] 1362, the matter in controversy, and we emphasize that phrase, must itself arise under the Constitution, laws, or treaties of the United States."); *Ponca Tribe*, 439 F. Supp. 2d at 1175. The Court now turns to whether the Pueblo's claim satisfies the "arises under" requirement of § 1331.

*1. Federal Question Jurisdiction*

Under 28 U.S.C. § 1331, federal courts have federal question jurisdiction over any case that "arises under" the laws of the United States. *Verlinden B.V. v. C. Bank of Nigeria*, 461 U.S. 480, 494 (1983). "A federal question exists 'only in those cases in which a well-pleaded complaint establishes that either federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Singh v. Duane Morris LLP*, 538 F.3d 334, 337 (5th Cir. 2008) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 27–28 (1983)). But "[w]hen a federal claim appears on the face of the complaint, 'dismissal for lack of subject matter jurisdiction is only proper in the case of a frivolous or insubstantial claim, i.e., a claim which has no plausible foundation or which is clearly foreclosed by a prior Supreme Court decision.'" *Young v. Hosemann*, 598 F.3d 184, 188 (5th Cir. 2010) (quoting *Bell v. Health-Mor*, 549 F.2d 342, 344 (5th Cir. 1977)).

The Pueblo invokes the Treaty of Guadalupe Hidalgo[5] between the United States and Mexico after the Mexican War as the basis for its declaratory judgment suit. Compl. ¶ 6. The Pueblo pleaded that its asserted right to the Property derives from the 1751 Spanish Land Grant that is allegedly "recognized by federal law, and the laws of Spain and Mexico, and preserved by the United States in the Treaty of Guadalupe Hidalgo." *Id.* Specifically, the Pueblo alleges that Article VIII of the Treaty of Guadalupe Hidalgo guaranteed citizens within the affected areas, which at the time included the Pueblo, protection of their land titles upon the transfer of sovereign authority from Mexico to the United States. *Id.* ¶ 16. On that basis, the Pueblo asks the Court to enter declaratory judgment to confirm that it is and has been the rightful holder of title to the Property since the 1751 Spanish Land Grant—allegedly preserved by the Treaty of

---

[5] Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic, 9 Stat. 922.

Guadalupe Hidalgo—and to declare that the City "ha[s] no estate, right, title or interest in or to the Property." *Id.* at 6.

In its motion for lack of subject-matter jurisdiction, the City argues that the Pueblo's allegation that the Treaty of Guadalupe Hidalgo guaranteed the protection of Spanish land grants "overlooks the requirement of a confirmation or recognition of title by the United States." City's Mot. at 8. Further, the City contends that prior Supreme Court decisions make clear that Spanish and Mexican land grants that were not validly confirmed by Congress after the Treaty of Guadalupe Hidalgo are judicially unenforceable—and thus, foreclosed under federal law. *Id.* at 8–9; City's Resp. in Opp. at 13 (ECF No. 58).

After due consideration, the Court is of the view that the Pueblo's claim does not raise a federal question because of two reasons: (1) the predicate cause of action for the Pueblo's declaratory judgment suit is based on state law, not federal law; and (2) the Pueblo's asserted right to the Property is not a federally derived right and does not involve a substantial federal issue. Further, even if a federal claim appears on the face of the Pueblo's Complaint, established Supreme Court precedent has foreclosed the authority of federal courts to determine the validity of the Pueblo's claim to the land. The Court addresses its conclusions in that order.

### a. *The Pueblo's Predicate Cause of Action for Declaratory Relief is Based on State Law, Not Federal Law.*

The Declaratory Judgment Act allows federal courts to declare the rights and legal relations of any interested party. *Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747, 769 (N.D. Tex. 2012); 28 U.S.C. §§ 2201–2202. Since the Declaratory Judgment Act is only a procedural device that creates no substantive rights, the plaintiff's declaratory relief must be premised on an independent cause of action. *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 752 n. 3 (5th Cir. 1996) *accord Ayers v. Aurora Loan Servs.*,

*LLC*, 787 F. Supp. 2d 451, 457 (E.D. Tex. 2011). However, in its Complaint, the Pueblo does not explicitly include an underlying cause of action for its declaratory judgment suit. Given the relief sought, the Court construes the predicate cause of action for the Pueblo's declaratory relief to be an action to quiet title. *See Duncan v. Bank of New York Mellon*, SA-13-CA-88-FB, 2013 WL 12394351, at *10 (W.D. Tex. May 1, 2013), *report and recommendation adopted sub nom. Duncan v. Bank of New York Mellon as Tr. for Certificateholders of CWABS, Inc.*, CV SA-13-CA-88-FB, 2013 WL 12394009 (W.D. Tex. June 24, 2013) (dismissing as redundant plaintiffs' declaratory judgment action asking the court to declare that defendants have no interest in a property because it was a duplicate of plaintiffs' claim to quiet title of the same property). Actions to quiet title are causes of action only rooted in state law because "there is no general federal cause of action for quieting title to land." *Vigil v. Hughes*, 509 F. App'x. 796, 797 (10th Cir. 2013).

Further, "the mere presence of a federal issue in a state cause of action does not automatically confer federal question jurisdiction." *Merrell Dow Pharms, Inc. v. Thompson*, 478 U.S. 804, 813 (1986). "[C]ourts have . . . held consistently that only [United States] treaties with a specific provision permitting a private action, or one to be clearly inferred, may suffice as the basis for federal jurisdiction. Otherwise, no cause of action is stated and no federal law applicable in the claim presented." *El Paso Cty. Water Imp. Dist. No. 1 v. Intl. Boundary and Water Comm'n., U.S. Sec.*, 701 F. Supp. 121, 124 (W.D. Tex. 1988) (quoting *Hanoch Tel-Oren v. Libyan Arab Republic*, 517 F. Supp. 542, 546 (D.D.C. 1981 (collecting cases), *aff'd*, 726 F.2d 774 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1003 (1985)).

The Fifth Circuit and other courts have consistently held that the Treaty of Guadalupe Hidalgo does not provide for a private action, or that one could be clearly inferred from it, and

thus, that plaintiffs cannot transform their state law property claims into federal questions by simply referring to Treaty. *See, e.g., Huckins v. Duval Cty., Fla.*, 286 F.2d 46, 49 (5th Cir. 1960) (noting that "[i]t is not enough for the plaintiffs to show that their claim is dependent upon a treaty" to create federal question jurisdiction over a land ownership dispute); *Vigil*, 509 F. App'x at 798 (affirming district court's holding that the Treaty of Guadalupe Hidalgo did not create federal jurisdiction for plaintiff's claims about disputed ownership of the land); *Santa Cruz Cty. v. Rattlesnake Properties, LLC*, 16-CV-05010-LHK, 2017 WL 462407, at *3 (N.D. Cal. Feb. 3, 2017) (holding that plaintiff's reliance on the Treaty of Guadalupe Hidalgo was "insufficient to confer federal subject matter jurisdiction over plaintiff's state law claims."); *Garcia v. Purdy*, 13-CV-0234 MCA/KBM, 2014 WL 12796880, at *13 (D.N.M. Mar. 11, 2014) (noting that plaintiff's claim concerned only whether he had a property interest in a right of way and whether defendants wrongfully interfered with that property interest, and holding that plaintiff "cannot transform his state law property claim into a federal question merely by referring to the Treaty of Guadalupe Hidalgo.").

Therefore, the Pueblo's state-law claim to quiet title does not "arise under" federal law because it is not a cause of action provided by the Treaty of Guadalupe Hidalgo or created by other federal law. Nor does the Pueblo's claim necessarily depend on the resolution of a substantial question of federal law merely because it refers to the Treaty of Guadalupe Hidalgo. *See Vigil*, 509 F. App'x. at 797–98 ("The only federal issue [plaintiff] asserts on appeal is that his grandmother's original claim was based on a federal treaty. But even accepting that contention as correct, this historical fact does not raise a 'federal issue . . . that is actually disputed and substantial.'" (quoting *Nicodemus v. Union Pac. Corp.*, 440 F.3d 1227, 1232 (10th Cir. 2006)).

### b. Pueblo's Asserted Right to the Property is Not a Federally Derived Property Right and Supreme Court Precedent Has Foreclosed the Authority of Federal Courts to Determine the Validity of the Pueblo's Claim to the Land.

In response to the City's contention about subject-matter jurisdiction, the Pueblo relies on *Oneida I*, 414 U.S. 661 (1974), and its progeny in asserting that the Court has jurisdiction under § 1331 and § 1362 because of its special posture as an Indian tribe and because its claim involves asserted rights to land premised on the Treaty of Guadalupe Hidalgo. Pueblo's Resp. in Opp. at 10–11 & n. 19 (ECF No. 60). However, the Court is of the view that Pueblo's reliance on *Oneida I* is misplaced because *Oneida I* does not support its argument that the Pueblo's Complaint is rooted in federal law.

To be sure, as the United States Supreme Court held in *Oneida I*, "Indian title is a matter of federal law." *Oneida I*, 414 U.S. at 670. In *Oneida I*, the Indian tribe prayed for damages for Indian land cessions to the State of New York that were alleged to be invalid when they were executed in the 1780's and 1790's because they were in violation of the Nonintercourse Act, 25 U.S.C. § 177[6]—forbidding the conveyance of Indian lands without the consent of the United States. *Id.* at 664–65. The district court dismissed the case for lack of subject-matter jurisdiction after it ruled that the tribe's cause of action was created under state law and that the "necessity of

---

[6] The Nonintercourse Act provides that:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

25 U.S.C. § 177.

interpreting a federal statute or treaties to resolve a potential defense was deemed insufficient to sustain federal question jurisdiction." *Id.* at 665. The Second Circuit affirmed the district court's holding. *Id.*

The Supreme Court reversed the district court's dismissal, holding that, while the tribe's claim was essentially a possessory action, "the complaint asserted a current right to possession conferred by federal law, wholly independent of state law." *Id.* at 666. First, the Supreme Court reasoned that Indian title or the aboriginal right of occupancy—the Indian tribes' recognized right of occupancy in the lands they occupied "from time immemorial" to the time the colonists arrived—"became the exclusive province of federal law after the United States was organized and the Constitution adopted." *Id.* at 667. Second, the Supreme Court noted that "[t]he Federal Government took . . . steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land." *Id.* And third, the tribe's complaint alleged a violation of the Nonintercourse Act, which reasserted the primacy of federal law with respect to aboriginal right of occupancy by making the power of Congress supreme as to extinguishing Indian title. *Id.* at 668–69. Hence, the Supreme Court concluded that:

> Given the nature and source of the possessory rights of Indian tribes to their aboriginal lands, particularly when confirmed by treaty, it is plain that the complaint asserted a controversy arising under the Constitution, laws, or treaties of the United States within the meaning of the United States within the meaning of both [§] 1331 and [§] 1362.

*Id.* at 667.

However, for the reasons that follow, the Court concludes that *Oneida I* is distinguishable from the Pueblo's case and thus, does not support its argument that its Complaint is rooted in federal law. Pueblo's Resp. in Opp. at 10–11 & n. 19.

First, as the City points out, the Pueblo's Complaint does not assert a right to possession based on an aboriginal right of occupancy—Indian title—like the one asserted in *Oneida I*. City's Resp. in Opp. at 15. A tribe can establish aboriginal title by "immemorial occupancy . . . to the exclusion of other Indians." *N.W. Bands of Shoshone Indians v. United States*, 324 U.S. 335, 338 (1945); *see also Mashpee Tribe v. Secretary of the Interior*, 820 F.2d 480, 481–82 (1st Cir. 1987) ("An Indian tribe establishes aboriginal title by showing that it has inhabited the land 'from time immemorial.'") (quoting *Cty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234 (1985) [hereinafter "*Oneida II*"]). The tribe does not have to trace its aboriginal title to a written document or land grant, but the tribe must show "historical evidence of the tribe's long-standing physical possession of the land." *Greene v. Rhode Island*, 398 F.3d 45, 50 (1st Cir. 2005) (quoting *Zuni Indian Tribe v. United States*, 16 Cl. Ct. 60, 671 (1989)).

Here, the Pueblo's Complaint clearly alleges that its tribe "[was] relocated by the Spanish from the Pueblo of Isleta, New Mexico, to [its] current locations between 1680 and 1682" and that "[i]n 1751, Spain granted the [Property]" to its members as communal property. Compl. ¶¶ 8–9. As such, the Pueblo's claim clearly involves non-aboriginal occupancy rights because the source of its alleged rights derives from a treaty by a prior sovereign, not from historical evidence of the Pueblo's long-standing physical possession of the Property "from time immemorial" to the time the colonists arrived. *See Miami Tribe of Okl. v. United States*, 175 F. Supp. 926, 936 (Ct. Cl. 1959) (discussing non-aboriginal occupancy rights) ("Where Congress has by treaty or statute conferred upon the Indians or acknowledged in the Indians the right to permanently occupy and use land, then the Indians have a right or title to that land which has been variously referred to in court decisions as 'treaty title', 'reservation title', 'recognized title', and 'acknowledged title.'"); *Seneca Nation of Indians v. New York*, 382 F.3d 245, 261 n. 17 (2d

Cir. 2004) (noting that the principles used to analyze the extinguishment of Indian right of occupancy granted by United States treaties and statutes are equally applicable to Indian treaties negotiated by Great Britain, a prior sovereign).

Second, Pueblo's claim of a non-aboriginal right of occupancy is not a federally derived property right because it was never guaranteed by a United States treaty or statute. The parallel Fifth Circuit case of *Burat's Heirs v. Board of Levee Commissioners of Orleans Levee District of State of the State of Louisiana,* 496 F.2d 1336 (5th Cir. 1974), is particularly instructive on this issue. In *Burat's Heirs,* the Fifth Circuit affirmed a district court's dismissal for lack of federal question jurisdiction of the plaintiffs' declaratory judgment action seeking to establish title to land settled by their ancestor before the Louisiana Purchase. *Burat's Heirs v. Bd. of Levee Com'rs of Orleans Levee Dist. of State of La.,* 496 F.2d 1336, 1337 (5th Cir. 1974). The plaintiffs in *Burat's Heirs* attempted to draw a parallel between their case and *Oneida I,* arguing that federal question jurisdiction existed because:

> (1) [the plaintiffs' ancestor] owned the land during French and Spanish control of the territory which predated the United States acquisition through the Louisiana Purchase; (2) an agency of the State of Louisiana unconstitutionally expropriated the land; and (3) there is a continuing federal interest flowing from the Treaty of 1803, which recognized the rights of those settled in the territory, various statutes which outlined the procedure for perfecting title, and the fact that certain portions of the [ancestor's] tract remained in the public domain.

*Id.* at 1341. But the Fifth Circuit found that *Oneida I* did not support the plaintiffs' argument because: (1) *Oneida I* involved an Indian tribe's aboriginal right of occupancy in the land; (2) the unconstitutional taking in *Oneida I* stemmed from tribe's cession of lands to the State of New York without the consent of the United States, which was forbidden under the Nonintercourse Act of 1790; and (3) the factor relevant here—the protection that the Treaty of 1803 extended to the land

of the plaintiffs' ancestor was not equivalent to that extended by the treaties between the federal government and the tribe. *Id.*

With respect to the third factor, the Fifth Circuit noted that the treaties involved in *Oneida I* "guaranteed to the tribe a right of occupancy, a present and continuing right to possession which could not be divested except by the United States."[7] *Id.* Then, the Fifth Circuit relied on the Supreme Court's interpretation of the governmental obligations flowing from the Treaty of 1803 in *Chouteau v. Eckhart*, 43 U.S. 344 (1844), to find that the Treaty made no such guarantees for the property rights of the inhabitants residing in the area acquired by the United States. *Id.* Specifically, the Fifth Circuit relied on the following passage from *Chouteau*:

> inchoate claims . . . were not changed in their character, by the treaty by which Louisiana was acquired; that the treaty imposed on this government only a political obligation to perfect them; that this obligation, sacred as it may be, in any instance, cannot be enforced by any action of the judicial tribunals; and that the legislation of Congress, from 1804, to the present time, has proceeded upon this construction of the treaty, as is manifested by the modes adopted to investigate the claims through boards of commissioners, and then acting on them by legislation.

*Id.* (quoting *Chouteau v. Eckhart*, 43 U.S. 344, 358–359 (1844)). Hence, the Fifth Circuit found that, according to *Choteau*, "the [Treaty of 1803] recognized that the inhabitants had certain

---

[7] A footnote in *Oneida I* explains in detail what the scope and protection of the treaties between the federal government and the Oneida tribe:

> Three treaties with the Six Indian Nations of the Iroquois Confederacy in New York were alleged: the Treaty of Fort Stanwix of 1784, which provides in part that "[t]he Oneida and Tuscarora nations shall be secured in the possession of the lands on which they are settled"; The Treaty of Fort Harmar of 1789 where the Oneida and the Tuscarora nations were "again secured and confirmed in the possession of their respective lands"; and the Treaty of Canandaigua of 1794, Art. II of which provides: "The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New-York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them . . . in the free use and enjoyment thereof: but the said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase."

*Oneida I*, 414 U.S. at 664 n. 3 (alterations in original).

property rights [and that] the subsequent statutes merely enabled the inhabitants to perfect those rights." *Id.* Therefore, the Fifth Circuit concluded that the Treaty of 1803 did not by itself extend the same guarantees to the inhabitants' property rights as the treaties discussed in *Oneida I* extended to the Indian tribes. *Id.*; *see also Gila River Indian Community v. Henningson, Durham & Richardson*, 626 F.2d 708, 714 (9th Cir. 1980) ("That such [possessory] rights were granted and governed by federal treaties and laws was the basis for the Court's holding in [*Oneida I*].").

Similarly here, applying the same reasoning from *Burat's Heirs*, the Court concludes that the Treaty of Guadalupe Hidalgo did not extend the same guarantees to Mexican citizens—allegedly including the Pueblo—as the treaties discussed in *Oneida I* extended to the Indian tribes. In *Tameling v. U.S. Freehold & Emigration Co.*, 93 U.S. 644 (1876), the Supreme Court analyzed the governmental obligations flowing from the Treaty of Guadalupe Hidalgo:

> We have repeatedly held that individual rights of property, in the territory acquired by the United States from Mexico, were not affected by the change of sovereignty and jurisdiction. They were entitled to protection, whether the party had the full and absolute ownership of the land, or merely an equitable interest therein, which required some further act of the government to vest in him a perfect title. The duty of providing the mode of securing them and fulfilling the obligations which the [Treaty of Guadalupe Hidalgo] imposed, was within the appropriate province of the political department of the government.

*Tameling v. U.S. Freehold & Emigration Co.*, 93 U.S. 644, 661 (1876). Simply put, the Treaty of Guadalupe Hidalgo recognized that citizens of Mexico had certain property rights within the ceded territory, but further acts by Congress were still required to fulfill the obligations imposed by the Treaty—i.e. to secure the property rights of Mexican citizens by vesting in them a perfect title. In *Astiazaran v. Santa Rita Land & Mining Co.*, 148 U.S. 80 (1893), the Supreme Court reasserted this interpretation of the Treaty's obligations:

> By article 8 of the treaty of Guadalupe Hidalgo . . . the property of Mexicans within the territory ceded by Mexico to the United States was to be "inviolably respected," and they and their heirs and grantees were 'to enjoy with respect to it

> guaranties equally ample as if the same belonged to citizens of the United States."
>
> . . . .
>
> Undoubtedly private rights of property within the ceded territory were not affected by the change of sovereignty and jurisdiction, and were entitled to protection, whether the party had the full and absolute ownership of the land, or merely an equitable interest therein, which required some further act of the government to vest in him a perfect title. But the duty of providing the mode of securing these rights and of fulfilling the obligations imposed upon the United States by the treaties belonged to the political department of the government; and congress might either itself discharge that duty, or delegate it to the judicial department.

*Astiazaran v. Santa Rita Land & Min. Co.*, 148 U.S. 80, 81–82 (1893) (internal citations omitted). As such, since Supreme Court precedent interprets the obligations flowing from the Treaty of 1803 and the Treaty of Guadalupe Hidalgo in a similar way, the Fifth Circuit's holding in *Burat's Heirs* is applicable here. Accordingly, the Pueblo's Complaint does not involve a substantial federal issue from which a determination from the Court would be decisive of its claim because the Treaty of Guadalupe Hidalgo by itself did not guarantee the Pueblo a right of occupancy and a present and continuing right to possession.

The Pueblo also does not allege that the United States negotiated a separate, independent treaty with it after the Treaty of Guadalupe Hidalgo "for delimitation of their occupancy rights or for the settlement and adjustment of their boundaries" that would constitute clear recognition of their aboriginal and non-aboriginal rights of occupancy in the Property. *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 346 (1941). Supreme Court precedent indicates that the United States did in fact negotiate such treaties with other Indian tribes that were living wholly or partially within the Mexican land cessions to the United States. *Id.* at 346, n. 4.[8]

---

[8] Among these include:

Treaty of July 1, 1852, 10 Stat. 979 (Apache Nation); Treaty of October 7, 1863, 13 Stat. 673, 674 (Tabeguache Band of Utah Indians); Treaty of March 2, 1868, 15 Stat. 619, Act of April 29, 1874, 18 Stat. 36, Act of June 15, 1880, 21 Stat. 199 (Ute Indians); Treaty of June 1, 1868, 15 Stat. 667 (Navajo Tribe).

Nor does the Pueblo allege that there is any act of Congress fulfilling the obligations imposed by the Treaty and securing its property rights in El Paso, Texas by vesting the Pueblo a perfect title in the Property. In contrast, Supreme Court precedent indicates that Congress did enact such statutes for claims involving land grants in California, New Mexico, and Arizona. *See Tameling*, 93 U.S. at 661 ("[In the Act of March 3, 1851], Congress required that all titles to real property in California, whether inchoate or consummate, should undergo judicial examination. . . . It became our duty . . . to decide on their validity, upon the documentary and other evidence incorporated in the record."); *see also id.* at 662 ("But Congress legislated otherwise for the adjustment of land-claims in New Mexico. By the . . . [A]ct of 1854, the duty of ascertaining their origin, nature, character, and extent was expressly enjoined upon the surveyor-general of that Territory. . . . He was directed to make a full report as to the validity or invalidity of each claim, under the laws, usages, and customs of the country before its cession to the United States. That report, . . . was to be laid before Congress for such action as might be deemed just and proper."); *Santa Fe Pac. R. Co.*, 314 U.S. at 350 ("The 1870 Act directed the Surveyor General of Arizona . . . to ascertain and report upon the origin, nature, character, and extent of the claims to lands in said Territory under the laws, usages, and customs of Spain and Mexico. His report was to be laid before Congress for such action thereon as shall be deemed just and proper.") (internal quotes omitted).[9] Yet, none of these congressional acts appear to be

---

*Id.*

[9] Further, Tenth Circuit case law indicates that other Pueblo Indian tribes secured their property rights through the modes prescribed in these congressional acts. *United States v. Thompson*, 941 F.2d 1074, 1075 (10th Cir. 1991) ("The Pueblo [of Santo Domingo] trace their title to the land from a 1689 grant by Spain, which was confirmed by Congress in 1858 and patented in 1864."); *Alonzo v. United States*, 249 F.2d 189, 191 (10th Cir. 1957) ("In its complaint[,] the United States further alleged that prior to the Treaty of Guadalupe Hidalgo, . . . the Pueblo possessed a good and complete title to a tract of land located in the Territory of New Mexico known as the Paguate Grant or the Paguate Purchase; that the title

applicable in this case.[10] Indeed, in its response to the City's Motion, the Pueblo confirms that none of those congressional acts secure the property rights it now claims because none of them are applicable to the El Paso area. Pueblo's Resp. in Opp. at 14–15.

Therefore, in the absence of any separate, independent treaty or applicable congressional statute recognizing and guaranteeing the rights of the Pueblo to the Property, the Court lacks authority to determine the validity of Pueblo's claim to the land. *See Sprint Commun., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) ("Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.' (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). That authority rests solely on Congress and is foreclosed to federal courts. As the Supreme Court has previously noted:

> The duty of protecting imperfect rights of property under treaties such as those by which territory was ceded by Mexico to the United States in 1848 and 1853, in existence at the time of such cessions, *rests upon the political, and not the judicial, department of the government. . . . To the extent only that congress has vested them with authority to determine and protect such rights can courts exercise jurisdiction.* Where, therefore, a tribunal of limited jurisdiction is created by congress to determine such rights of property, a party seeking relief must present for adjudication a case clearly within the act, or relief cannot be given.

---

of the Pueblo to the lands within the Paguate Purchase was confirmed by the Act of Congress of June 21, 1860 . . . as Claim No. 30 on a list of claims recommended for confirmation by the Surveyor General, pursuant to the Act of Congress of July 22, 1854 . . . . That such title of the Pueblo to 75,406.27 acres of such lands was further confirmed by a patent, dated September 22, 1884, from the United States to the Pueblo.").

[10] The Pueblo Lands Act of 1924, 43 Stat. 641, which particularly addresses land disputes involving the Pueblo Indian lands, also does not appear applicable to this case. In 1924, Congress enacted the Pueblo Lands Act "to provide for the final adjudication and settlement of a very complicated and difficult series of conflicting titles affecting lands claimed by the Pueblo Indians of New Mexico." *Mt. States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 240 (1985).

Under the Pueblo Lands Act, a Public Lands Board, composed of the Secretary of the Interior, the Attorney General, and a third person to be appointed by the President of the United States, was established to determine conflicting claims to the Pueblo lands. *Id.* at 244. The Board would issue a report setting forth the metes and bounds of the lands of each Pueblo that were found not to be extinguished under the rules established in the Act. *Id.* The Act provided that the Board's reports were to be implemented by suits to quiet title in the United States District Court for the District of New Mexico. *Id.* at 245.

*United States v. City of Santa Fe*, 165 U.S. 675, 714 (1897) (emphasis added).

And third, the Pueblo did not assert a claim under the Nonintercourse Act like the one asserted in *Oneida I*. Although the Pueblo argues in its Motion that the Nonintercourse Act applies to the land it claims, Pueblo's Mot. at 10, it is well established Fifth Circuit law that the Pueblo cannot raise a new claim not asserted in its original complaint in a summary judgment motion. *U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x. 521, 522 (5th Cir. 2012) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)); *see also Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004) ("[T]he Supreme Court has mandated a liberal pleading standard for civil complaints . . . . This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage . . . . At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."). Further, the Pueblo's Complaint alleges facts relating only to the validity of its claim to the Property based on the 1751 Spanish Land Grant, and not to any violations of the Nonintercourse Act. *Cf. Oneida I*, 414 U.S. at 664 ("It was then alleged that in 1788 the Oneidas had ceded five million acres to the State of New York[.] . . . Assertedly, the 1795 cession was without the consent of the United States and hence ineffective to terminate the Indians' right to possession under the federal treaties and the applicable federal statutes.").

Accordingly, as discussed *supra*, in the absence of any separate, independent treaty or applicable congressional statute recognizing and guaranteeing the rights of the Pueblo to the Property, the Court concludes that prior Supreme Court decisions have foreclosed the Court's authority to determine the validity of Pueblo's claim to the land. Therefore, the Court concludes

that it lacks subject-matter jurisdiction to adjudicate the merits of the Pueblo's claim against the City.

### III. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant City of El Paso's "Motion for Summary Judgment" (ECF No. 56) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to Defendant's motion for lack of subject matter jurisdiction. The Motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that all claims asserted by Plaintiff Ysleta Del Sur Pueblo against Defendant City of El Paso in the above-captioned case are **DISMISSED WITH PREJUDICE**.

**IT IS MOREOVER ORDERED** that all pending motions, if any, are **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the Clerk of the Court **SHALL CLOSE** this matter after docketing the Final Judgment to be issued separately on this day.

So ORDERED and SIGNED this 15th day of January 2020.

DAVID C. GUADERRAMA
**UNITED STATES DISTRICT JUDGE**